IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | CIVIL ACTION |
| *ex rel.* **AARON SHILOH, M.D., FSIR,** | : | |
| *Plaintiff,* | : | |
| | : | **NO. 18-5458** |
| **v.** | : | |
| | : | |
| **PHILADELPHIA VASCULAR** | : | |
| **INSTITUTE LLC, *et al.,*** | : | |
| *Defendants.* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                      JUNE 12, 2026

# MEMORANDUM OPINION

**INTRODUCTION**

Realtor Dr. Aaron Shiloh, ("Dr. Shiloh" or "Relator"), filed this *qui tam* action against

Defendants James McGuckin, M.D., ("Defendant McGuckin"), his former employer, and the

Philadelphia Vascular Institute, LLC, asserting that Defendants violated the False Claims Act, (the

"FCA"), 31 U.S.C. § 3729 *et seq.*  On February 28, 2023, the United States of America,[1] (the

"Government"), filed a notice of intervention on behalf of Dr. Shiloh, (ECF 27), and on May 1,

2023, filed a complaint in intervention, (the "operative complaint"), against Defendant McGuckin

---

[1]     The Government brings this action on behalf of the United States Department of Health and Human
Services, ("HHS"); the Centers for Medicare & Medicaid Services, ("CMS"), which administers the
Medicare program, ("Medicare"), 42 U.S.C. §§ 1395 *et seq.*; and the United States Office of Personnel
Management, ("OPM"), which administers the Federal Employee Health Benefits Program, ("FEHBP").
(ECF 32 at ¶ 1).

his practices[2] and management companies,[3] (collectively "Defendants"), averring claims under the FCA and the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b), (g).  (ECF 32).

On March 13, 2026, the Government filed an *ex parte* application pursuant to the Federal Debt Collection Procedures Act, ("FDCPA"), 28 U.S.C. §§ 3101, 3102, seeking to attach prejudgment writs to six of Defendant McGuckin's properties.  The Government's application was approved on March 30, 2026.  (ECF 92).

Before this Court is Defendants' underlying motion to quash the writs of attachment filed pursuant to 28 U.S.C. § 3101(d)(2), (ECF 102), the Government's response in opposition, (ECF 108), and Defendants' reply to the Government's response, (ECF 110).  In compliance with the FDCPA, a hearing on Defendants' motion to quash was held on June 4, 2026.  (ECF 115).  The parties, represented by counsel, were present, as were three witnesses.  (*Id.*).  The issues have been fully argued and briefed and are ripe for disposition.  For the reasons set forth herein, Defendants' motion to quash the prejudgment writs is denied.

**FACTUAL BACKGROUND**

To address the issues presented in Defendants' motion to quash, a summary of the factual and procedural histories is helpful:

> As noted, the Government filed the operative complaint raising claims under the FCA against Defendants for, *inter alia*, knowingly submitting or causing the submission of false claims for reimbursement to federal health care programs for medically unnecessary invasive vascular procedures, knowingly making false statements to the Government related to those procedures, and violating the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b), (g).  (ECF 32).  In the operative complaint, the Government avers that Defendant McGuckin was paid over $6.5 million in more than 500 claims which were medically unnecessary procedures he

---

[2]    The practices include: Lehigh Valley Vascular Institute LLC; PA Vascular Institute LLC; Peripheral Vascular Institute of Philadelphia, LLC; and Main Line Vascular Institute LLC.

[3]    The management companies include Philadelphia Vascular Institute, LLC and Pennsylvania Vascular Institute, PC.

personally performed, and unjustifiably waived $89,032.91 in Medicare copays for two anonymous patients, MH and RD.  (*Id.* at pp. 3, 67, 76).

On March 13, 2026, the Government filed an *ex parte* motion to file under seal an *ex parte* application, (the "Application"),for prejudgment remedies pursuant to the FDCPA, 28 U.S.C. §§ 3101, 3102. (*See* ECF 82).  This Court granted the motion and directed the Clerk of Court to docket under seal the Application, exhibits, and other supporting materials. (*See* ECF 88 to 88-56).  By Order entered on March 30, 2026, the Application was approved upon this Court finding that the Government had complied with the requirements of 28 U.S.C. § 3101, ("Section 3101").  (ECF 92).  However, due to certain deficiencies in the writs, the Court directed the Government to file amended writs that complied with 28 U.S.C. § 3102(c).  (*Id.*).  Upon the Government's submission of the statutorily compliant writs, the Court directed their issuance.  (ECF 97).

On May 22, 2026, pursuant to 28 U.S.C. § 3101(d)(2), ("Section 3101(d)(2)"), Defendants filed a motion to quash the writs of attachment and for an evidentiary hearing.  (ECF 102).  Subsection 3101(d)(2) requires that a hearing be held "as soon as practicable."  Accordingly, this Court scheduled a hearing for June 4, 2026.  (ECF 103).  Thereafter, the Government filed its response in opposition, along with supporting exhibits, and a witness list.   (ECF 108 to 108-54). Defendants filed their reply, (ECF 110), along with two separate witness lists and exhibits, (ECF 109, 111).

At the June 4, 2026 hearing, this Court explained that the hearing was essentially limited to addressing whether Defendant McGuckin's properties should remain attached, or whether the prejudgment writs should be quashed.  Defendant McGuckin and Donna Venditto, a software consultant formerly employed by Defendant McGuckin, testified on behalf of Defendants, and Dawn M. Wiggins, a Department of Justice healthcare fraud analyst who participated in the investigation of the allegations against Defendant McGuckin and his businesses, testified on behalf of the Government.

**LEGAL STANDARD**

Pursuant to the FDCPA, "[t]he United States may, in a proceeding in conjunction with the complaint or at any time after the filing of a civil action on a claim for a debt, make application under oath to a court to issue any prejudgment remedy."  28 U.S.C. § 3101(a)(1).  If a court determines "that the requirements of subsections (a), (b), and (c) [of Section 3101 of the FDCPA] have been met, the court shall issue all process sufficient to put into effect the prejudgment remedy sought."  28 U.S.C. § 3101(e).

3

Specifically, an application for a prejudgment remedies satisfies Section 3101(a) if it "set[s] forth the factual and legal basis for each prejudgment remedy sought[,]" "state[s] that the debtor against whom the prejudgment remedy is sought shall be afforded an opportunity for a hearing[,]" and "set[s] forth with particularity that all statutory requirements under this chapter [28 USCS §§ 3001 *et seq.*] for the issuance of the prejudgment remedy sought have been satisfied." 28 U.S.C. § 3101(a)(2), (3)(A)-(B).

The government satisfies Section 3101(b) if it shows "reasonable cause to believe" that a debtor:

(A) is about to leave the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt;

(B) has or is about to assign, dispose, remove, conceal, ill-treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States;

(C) has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States; or

(D) has evaded service of process by concealing himself or has temporarily withdrawn from the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States[.]

28 U.S.C. § 3101(b)(1)(A)-(D).

Finally, an application for a prejudgment remedy satisfies Section 3101(c) if the Government files with its application an affidavit "establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." 28 U.S.C. § 3101(c)(1). Moreso, "[t]he affidavit shall state — (A) specifically the amount of the debt claimed by the United States and any interest or costs attributable to such debt; (B) one or more of the grounds specified in

subsection [3101](b); and (C) the requirements of section 3102(b), 3103(a), 3104(a), or 3105(b) [28 USCS § 3102(b), 3103(a), 3104(a), or 3105(b)], as the case may be." 28 U.S.C. §§ 3101(c)(2)(A)-(C).

Upon issuance of prejudgment writs, the debtor, here Defendants, may move to quash the writs on the following limited grounds:

(A)     the probable validity of the claim for the debt for which such remedy was granted and of any defense or claim of exemption asserted by such person;

(B)     compliance with any statutory requirement for the issuance of the prejudgment remedy granted;

(C)     the existence of any ground set forth in subsection (b); and

(D)     the inadequacy of alternative remedies (if any) to protect the interests of the United States.

28 U.S.C. §§ 3101(d)(2)(A)-(D).

## DISCUSSION

In the underlying motion to quash the prejudgment writs, and pursuant to Section 3101(d)(2)(A), Defendants challenge the *probable validity* of the Government's claim for a $6.5 million debt for violations of the FCA and a $89,032.91 debt for violations of the Anti-Kickback Statute.  (*See* ECF 82).  Accordingly, at the hearing, Defendant McGuckin testified regarding his practice, his billing practices, the loss of his Medicare and Medicaid revenue, the bankruptcy proceeding involving Defendant McGuckin's former business, Vascular Access Centers, L.P., and the sale of his businesses and properties which apparently precipitated the Government's requests for prejudgment writs of attachment.  Defendants' evidence related to Defendant McGuckin's sales of his businesses and properties in an apparent attempt to quash the prejudgment writs pursuant to

Section 3101(d)(2)(C). This Court will address Defendants' argument on each of the limited grounds for quashing a writ raised.

## I. Probable Validity of the Government's Claim for a Debt (28 U.S.C. § 3101(d)(2)(A))

"In order to obtain a prejudgment remedy, Section 3101(c)(1) requires the Government to include with its application an 'affidavit establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application.'" *United States v. Cent. Med. Sys., LLC*, 2018 WL 5112911, at *4 (M.D. Fla. Oct. 19, 2018) (quoting 28 U.S.C. § 3101(c)(1)). "This 'probable validity' standard does not require proof rising to the level of that required at trial but rather requires only that the Government meet the probable cause standard." *Id.* "To satisfy its burden of the probable validity of the debt, the Government need not be successful on all of its multiple independent claims for liability. Rather, in evaluating the probable validity of the debt, the Court adopts a 'totality of the circumstances' approach." *United States v. Teeven*, 862 F. Supp. 1200, 1218 (D. Del. 1992).

"[A]t the post-deprivation hearing authorized by 28 U.S.C. § 3101(d)(2), the 'Government and the debtor defendants generally engage in a burden-shifting exercise where the debtor bears the initial burden of putting forward evidence that places the Government's showing of the probable validity of the debt in dispute." *Cent. Med. Sys., LLC*, 2018 WL 5112911, at *4 (quoting *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 460, 465 (D.S.C. 2016)). The debtor may place in dispute the Government's showing of probable validity

> through cross-examination of the affiant or other witnesses relied on by the Government. Where, for example, the Government's affidavit is not based on personal knowledge and the reliability of the source of information is not established, a defendant could successfully place in dispute the Government's showing of probable validity.

6

> Where . . . [the Government's] affidavit is sufficiently particularized and [the] sources of information are shown to be reliable because they have personal knowledge of the events about which they provided information, [the debtor] must come forward with affirmative evidence to rebut the Government's showing, that is, "some substantive evidence at the hearing." [*Teeven*, 862 F. Supp. at 1218].

*U.S. ex rel Doe v. DeGregorio*, 510 F. Supp. 2d 877, 885-86 (M.D. Fla. 2007). "[T]he Section 3101(d)(2) hearing is not intended to be a trial on the merits." *Teeven*, 862 F. Supp. at 1211.

Defendants argue that the Government has not proffered any evidence – affidavits, depositions, or sworn testimony – to support its claim that Defendant McGuckin submitted, as alleged, (ECF 32 at ¶ 272) "over 500 false claims" to Medicare for medically unnecessary procedures and, as such, the Government's FCA claim has no probable validity, (ECF 102 at p. 7). Defendants take issue with the fact that the Government's affidavit relies on a medical expert, (the "Medical Expert"), and a statistician, (the" Statistical Expert"), who are not identified and whose reports have not been produced. (*Id.* at p. 15). Defendants also argue that the Government's Anti-Kickback Statute claims have no probable validity because the copayment waivers given to MH and RD were permitted. (*Id.* at pp. 11-15). Defendant, for the first time at the hearing, invoked the "missing witness doctrine," arguing that the Government's decision to not have Dr. Shiloh testify requires an adverse inference against the Government's claims.

In response, the Government argues that, in granting the prejudgment writs, this Court has already determined the probable validity of their claims. (ECF 108 at pp. 6-10). The Government contends that Defendants have not met their burden to demonstrate that both its FCA and Anti-Kickback Statute claims lack probable validity. (*Id.* at pp. 10-20). Finally, the Government argues that it is not required to present expert opinion to support its motion for a prejudgment remedy. (*Id.* at pp. 22-23). Based on the totality of circumstances and as discussed

7

*infra*, this Court finds that Defendants have not met their burden to quash the prejudgment writs of attachment issued on March 30, 2026, (ECF 92).

### A. Government's Proof of Probable Validity

Here, the Government's proof in support of its Application for prejudgment writs is a declaration from Dawn M. Wiggins, ("Investigator Wiggins"), a healthcare fraud investigative analyst at the Department of Justice's Civil Division, Commercial Ligation, Fraud Section. (Wiggins Aff., ECF 108-2). Investigator Wiggins in her declaration and testimony attested that she had personal knowledge of the facts set forth in her declaration. (*Id.* at ¶ 4). As an auditor in the United States Attorney's Office, Investigator Wiggins participated in the Government's investigation of Dr. Shiloh's allegations against Defendants under the FCA and Anti-Kickback Statute, personally reviewed numerous documents produced by Defendants in response to Civil Investigative Demands for the production of documents issued by the Government during its investigation; obtained and reviewed Medicare claims data and public records; and participated in witness interviews and meetings with Defendants' counsel. (*Id.* at ¶ 3). Investigator Wiggins detailed her findings regarding the probable validity of both the FCA and Anti-Kickback Statute claims, as discussed below. (*Id.* at ¶¶ 5-29).

### i. FCA Claim

"There are two categories of false claims under the FCA: a factually false claim and a legally false claim." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). "A claim is factually false when the claimant misrepresents what goods or services it provided to the Government." *Id.* A claim is legally false when a claimant knowingly falsely certifies that it has complied with a statute or regulation, compliance with which is a condition or precondition for government payment. *Id.*; *see also United States ex rel. Petratos v. Genentech*

*Inc.*, 855 F.3d 481, 486 (3d Cir. 2017).  The second category, legally false claims, is subcategorized into two theories of liability:  "express false certification" and "implied false certification."  *United States ex rel. Sirls v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 445 (E.D. Pa. 2020).

"Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds."  *Wilkins*, 659 F.3d at 305 (quoting *Rodriguez v. Our Lady of Lourdes Med. Ctr.*, 552 F.3d 297, 303 (3d Cir. 2008)).  Implied false certification liability "attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." *Id.*; *see also Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 181 (2016).  For liability to attach, the defendant's false certification "about its compliance with a legal requirement [must be] 'material to the Government's payment decision.'"  *United States ex rel. Greenfield v. Medco Health* Sols., Inc., 880 F.3d 89, 94 (3d Cir. 2018) (quoting *Universal Health Servs.*, 579 U.S. at 181).  "Materiality" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money." 31 U.S.C. § 3729(b)(4).

Medicare regulation 42 C.F.R. § 424.24(g)(1) requires that all claims for "covered medical and other health services furnished by providers" include a certification that "[t]he services were medically necessary[.]"  In FCA cases alleging lack of medical necessity, certification to the government is "false simply 'if the procedure was not reasonable and necessary under the government's definition of the phrase.'"  *United States ex rel. Druding v. Care Alternatives*, 952 F.3d 89, 97 (3d Cir. 2020) (quoting *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 743 (10th Cir. 2018)).  A difference in opinion as to the medical necessity of a procedure is sufficient to raise a triable issue of fact regarding falsity.  *See id.* at 101 ("We therefore find that a

physician's expert testimony challenging a hospice certification creates a triable issue of fact for the jury regarding falsity.  Since [the] expert report has done just that, we conclude the report was sufficient evidence to create a genuine dispute of material fact.").

Here, to show the probable validity of the Government's FCA claim, Investigator Wiggins relied on the findings of two independent experts, *to wit*: a Statistical Expert and a Medical Expert. (*Id.* at ¶¶ 7-10).  The Statistical Expert generated an investigatory sample of Medicare claims that were submitted on behalf of Defendant McGuckin's patients for a specific procedure, (*id.* at ¶¶ 6-7), and the Medical Expert reviewed the sample to form an opinion as to the medical necessity of the procedures, (*id.* at ¶¶ 8-9).  After extrapolating the samples and based on their expertise and analysis, the Government's experts opined that Defendant McGuckin submitted 500 false claims to Medicare for medically unnecessary procedure, resulting in Defendant McGuckin's being paid over $6.5 million from Medicare.  (*Id.* at ¶ 11).

The Government's experts had personal knowledge of the investigation, reviewed materials related to it, and made their findings.  The Medical Expert made determinations regarding the medical necessity of Defendant McGuckin's procedures, and the Statistical Expert, who, based on those findings, extrapolated those findings to account for a potentially larger sample size. Therefore, having supported her findings with her personal knowledge of the Government's investigation and personal analysis which relied on the opinions of two experts, Investigator Wiggins' declaration and testimony sufficiently established probable validity of the Government's FCA claim for legally false claims.

ii.    *Anti-Kickback Statute Claims*

"The [Anti-Kickback] Statute prohibits 'knowingly and willfully' offering or paying 'any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the

furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal health care program.'" *Greenfield*, 880 F.3d at 94-95 (omissions in original) (quoting 42 U.S.C. § 1320a-7b(b)(2)(A)). "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" under the FCA. 42 U.S.C. § 1320a-7b(g). "For a[n] [FCA] violation, [a relator] must prove that at least one of [defendant's] claims sought reimbursement for medical care that was provided in violation of the Anti-Kickback Statute (as a kickback renders a subsequent claim ineligible for payment)." *Greenfield*, 880 F.3d at 98.

To demonstrate the probable validity of the Government's Anti-Kickback Statute claim, Investigator Wiggins' declaration relied on her own evaluation of copayment and billing records submitted to the Government. (ECF 108-2 at ¶¶ 12-29). Based on that review, Investigator Wiggins attested that Defendant McGuckin's records confirmed that Defendants understood the rules governing Medicare copayments, including that Medicare beneficiaries are generally responsible for the copayment of twenty percent of the cost of the procedure, and understood the circumstances under which a waiver of a Medicare copayment was permissible. (*Id.* at ¶ 14). Investigator Wiggins identified Defendant McGuckin's official waiver policy, (the "Charity Policy"), where copayments were waived for patients who were low income or indigent that completed an application for financial assistance and submitted it with supporting documentation, including federal tax returns, prior to the scheduled date of their procedure. (*Id.* at ¶¶ 16-17). Particularly, Investigator Wiggins relied on patients RD and MH's specific medical files to support the Government's claim that Defendant McGuckin waived $89,032.91 in Medicare copayments that were not covered by Medicaid as "charity write offs." (*Id.* at ¶¶ 18-29). Investigator Wiggins also attested and testified that the patient files did not include the required documentation to receive relief under Defendants' Charity Policy. (*Id.* at ¶¶ 22, 29).

11

This Court finds Investigator Wiggins' testimony credible. Her declaration also supports the probable validity of the Government's Anti-Kickback Statute claim against Defendants; specifically, that Defendants submitted claims to Medicare where patients did not pay copayments and that the copay waivers were based on a policy that the patients were not eligible.

### B. Defendants' Additional Evidence Disputing Probable Validity

#### i. Missing Witness Doctrine

Defendants request that an adverse inference be drawn in their favor because the Government's failed to present Relator Dr. Shiloh, a critical witness, at the hearing. However, Relator Dr. Shiloh would not have provided any reliable testimony why the Government chose to apply for the prejudgment writs or testimony related to the limited grounds to quash those writs. As such, this Court finds that Defendants' reliance on the "missing witness doctrine" is misplaced. "The basis of the 'missing witness' inference is that, where a party fails to call an available witness whose testimony could be expected to favor him, a natural inference arises that that witness would have exposed facts [u]nfavorable to that party." *United States v. Busic*, 587 F.2d 577, 586 (3d Cir. 1978), *rev'd on other grounds*, 446 U.S. 398 (1980). As discussed, the FDCPA only requires the Government to proffer an affidavit to obtain a prejudgment writ. 28 U.S.C. § 3101(c)(1). The statute does not require the Government to proffer a relator for the purposes of a hearing on a motion to quash prejudgments writs. *See* 28 U.S.C. § 3101(d)(2) (detailing the requirements of a hearing on a motion to quash prejudgment writs); *see also Teeven*, 862 F. Supp. at 1217 n.22 ("[T]he Court *may* consider the testimony of live witnesses if the respective parties choose such a course or the hearing may be limited to the briefs and affidavits submitted by the parties." (emphasis added)). Because the FDCPA does not require

12

Relator Dr. Shiloh to testify at a hearing on a motion to quash prejudgment writs, and the reasons expressed, Defendants' invocation of the missing witness doctrine is inapposite here.

<em>ii.     FCA Claim</em>

In their motion to quash, Defendants also argue that the Government failed to proffer *any* evidence to support the probable validity of its claims and that the Government relied on unidentified experts and "hidden" analyses of its Medical and Statistical Experts.  (ECF 102 at pp. 7, 12).  At the hearing, Defendant McGuckin testified at length about the medical necessity of his procedures.  Defendants also had the opportunity to cross-examine Investigator Wiggins regarding her reliance on both the Medical and Statistical Experts' findings.[4]  When asked whether she had firsthand knowledge of the facts underlying the FCA claim, Investigator Wiggins testified that she was involved in the discussions around the Medical Expert and with the Statistical Expert when they determined that the single-damage amount was $6.5 million.  Defendants also raised issue with the qualifications of the Medical Expert, arguing that the Medical Expert had never worked with the Government, that the Medical Expert was not an interventional radiologist like Defendant McGuckin, and that Investigator Wiggins was not aware of the types of procedures the Medical Expert could perform.

This Court finds that in determining the potential debt oft Defendant McGuckin, Investigator Wiggins reasonably relied on experts who personally investigated and, thus, had personal knowledge of the facts and circumstances of the Government's investigation.  *See DeGregorio*, 510 F. Supp. 2d at 886 ("Where . . . [the Government's] affidavit is sufficiently particularized and [the] sources of information are shown to be reliable because they have personal

---

[4]     In its response to the motion to quash, the Government identifies its Medical Expert as Dr. Caitlin Hicks, M.D., and its Statistical Expert as Michael Petron, CPA, CFE.  (ECF 108 at p. 10).

knowledge of the events about which they provided information, [the debtor] must come forward with affirmative evidence to rebut the Government's showing . . . ."). Nothing on cross-examination raised doubts regarding the reliability of Investigator Wiggins' sources. *See id.* at 885-86 ("Where, for example, the Government's affidavit is not based on personal knowledge and the reliability of the source of information is not established, a defendant could successfully place in dispute the Government's showing of probable validity."). Here, Investigator Wiggins' declaration was based on personal knowledge and reliable sources to support a showing of probable validity.

Defendant McGuckin's testimony regarding the medical necessity of his procedures was not sufficient to contest the probable validity of the Government's FCA claim. As previously stated, under an FCA legally false claim, a certification to the government is "false simply 'if the procedure was not reasonable and necessary under the government's definition of the phrase.'" *Druding*, 952 F.3d at 97 (quoting *Polukoff*, 895 F.3d at 743). Defendant McGuckin's testimony simply raises a genuine issue of material fact best settled at trial. *See Druding,* 952 F.3d at 101. As such, Defendants fail to dispute the probable validity of the Government's FCA claim for a $6.5 million debt.

*iii.    Anti-Kickback Statute Claim*

Defendants raise the following arguments to contest the probable validity of the Government's Anti-Kickback Statute claim; *to wit*: (1) both patients who Investigator Wiggins reviewed files for, RD and MH, were Medicaid beneficiaries at the time they were billed for their PAD procedures; (2) Defendants collected or wrote off copays in compliance with Medicare requirements; and (3) both RD and MH were eligible for the company's Charity Policy. (ECF 102 at p. 12). Each argument is addressed in turn.

14

**RD and MH's Medicaid Status**

In her declaration and testimony at the hearing, Investigator Wiggins relied on billing statements for multiple PAD procedures performed on April 9, 2019 for patient RD, (Gov. Ex. 14, ECF 108-25), and billing statements for those multiple PAD procedures performed over the course of ten visits between July 12 and December 10, 2019 for MH, (Gov. Ex. 16, ECF 108-27). Investigator Wiggins relied on these billing statements to determine that RD and MH were not Medicaid recipients and that Defendants had waived copayments pursuant to Defendants' Charity Policy.  (ECF 108-2 at ¶¶ 18-19, 25-26).

To counter Investigator Wiggins' declaration, Defendants proffered photos of screen shots of RD and MH's individual Pennsylvania Access Cards.  (Defs. Ex. A, ECF 102-3).  At the hearing, Defendant McGuckin's former software consultant, Donna Venditto, testified that Pennsylvania Access Cards were the patient's Medicaid cards that were scanned into Defendants' billing system by receptionists.  Defendants also proffered a financial assistance application signed by MH on July 27, 2020, and billing statements for PAD procedures Defendant McGuckin performed on MH that took place from July 2019 to October 2020.  (Defs. Ex. C, ECF 102-5).

Investigator Wiggins explained that Pennsylvania Access Cards do not necessarily mean that a person is on Medicaid benefits since the Commonwealth of Pennsylvania may issue these Access cards for a variety of cash assistance programs.  As to the system in which the Pennsylvania Access Cards were entered into in Defendants' office, Investigator Wiggins testified that she did not recognize the image as a Medicaid system, but as a billing system.  Furthermore, Investigator Wiggins identified that MH's information was entered into Defendants' billing system in April of 2020, *after* the particular PAD procedures that she reviewed for MH had been performed.  Finally, Investigator Wiggins testified to the fact that MH's financial assistance application was submitted

15

*after* the PAD procedures she had been reviewing.  Based on this conflicting evidence, Defendants failed convincingly to rebut Investigator Wiggins' finding that RD and MH were not Medicaid recipients at the time Defendant McGuckin billed them for PAD procedures.

**Copay Collection and Waiver Practices**

Investigator Wiggins also testified that she did not find any evidence of Defendants' efforts to collect co-pays regarding patients MH and RD.  On cross-examination, Defendants asked Investigator Wiggins if she based her finding that Defendant McGuckin had committed fraud on the fact that the billing statements used the term "charity write off" rather than "uncollectible." Investigator Wiggins responded that the records she reviewed showed waivers of copays that would typically have been a patient's responsibility to pay and that Defendants had a "Charity Policy" that would relate to the "charity write off" billing designation.  (*Id.*).  A review of RD and MH's actual billing statements confirms Investigator Wiggins' testimony that the patient record did not use the phrase "uncollectible," but instead consistently use "charity write off."  (Gov. Ex. 14, ECF 108-25); (Gov. Ex. 16, ECF 108-27).  Therefore, Defendants have not disproved Investigator Wiggins' findings and the inference that Defendants had a policy for waiving copays for allegedly indigent patients and that the policy was used to waive copays for the records that Investigator Wiggins reviewed.

**RD and MH's Eligibility for Charity Policy**

Finally, Defendants argue that they have provided sufficient evidence to demonstrate that RD and MH were eligible for their Charity Policy and, thus, could have their copays waived. Defendants are mistaken.  Defendants did not offer evidence demonstrating that RD or MH had applied for the Charity Policy prior to receiving the PAD procedures Investigator Wiggins reviewed.  Therefore, Defendants have not provided substantive evidence to rebut Investigator

16

Wiggins' findings that RH and MD were not eligible for, and had not enrolled in, the Charity Policy prior to receiving PAD procedures from Defendant McGuckin.

While some of this argument and evidence of record is beyond the scope of the hearing, nevertheless it has been considered.  Based on the totality of the evidence, this Court finds that the Government has shown the probable validity of its FCA claim for $6.5 million and Anti-Kickback Statute claim for $89,032.91, and that Defendants have not met their burden under Subsection 3101(d)(2)(A) to quash the prejudgment writs.

## II. Whether Disposal of Property has the Effect of Hindering the Government (28 U.S.C. § 3101(d)(2)(C))

Although not pled nor argued in the motion to quash, Defendants argued at the hearing that the underlying activity that led to the Government seeking the prejudgment writs of attachment – *i.e.*, Defendant McGuckin's sale of his practices, and his sale and mortgaging of various properties – was not intended to hinder the Government's efforts to collect, such there be such determination. These arguments are construed as Defendants' attempt to quash the writs pursuant to Section 3101(d)(2)(C).

As previously noted, in moving to quash a prejudgment writ pursuant to Section 3101(d)(2)(C), the FDCPA allows a debtor to challenge "the existence of any ground set forth in" Section 3101(b).  The government satisfies Section 3101(b) if it shows "reasonable cause to believe" that a debtor: is about to leave the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt; has or is about to assign, dispose, remove, conceal, ill-treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States; has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States; or has evaded service of

17

process by concealing himself or has temporarily withdrawn from the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States[.]  *See* 28 U.S.C. §§ 3101(b)(1)(A)-(D).

Here, the Government sought writs of attachment arguing that Defendant McGuckin "ha[d] or [was] about to assign, dispose, remove, conceal, ill-treat, waste, or destroy property" and "ha[d] or [was] about to convert [his] property into money, securities, or evidence of debt in a manner prejudicial to the United States[.]"  *See* 28 U.S.C. §§ 3101(b)(1)(B), (C).

In support of its contention, the Government identified two of Defendant McGuckin's financial transactions; *to wit*: (1) the sale, reacquisition, and closure of his practices; and (2) the conversion and encumbrance of real estate assets.  (Wiggins Aff., ECF 108-2 at ¶¶ 31-50).  In her declaration, Investigator Wiggins attested that, upon being informed of the *qui tam* operative complaint in January 2022, it appeared that Defendant McGuckin began selling his practices— all but one of the entities named as Defendants in this action — to Dr. Wayne Arnold, ("Arnold"), , and that Arnold subsequently sold them back to Defendant McGuckin in 2023.  (*Id.* at ¶¶ 35-38).  When the Centers for Medicare and Medicaid Services informed Defendant McGuckin that it was suspending all Medicare payments to him, Defendant McGuckin closed all of his practices.  (*Id.* at ¶¶ 33-41).  Investigator Wiggins also identified three properties that Defendant McGuckin sold in 2023 for a total sum of $1,148,500, and a fourth property that Defendant McGuckin encumbered by deeding the property to himself and his wife as tenants-by-the-entirety and mortgaging the property with Cake Mortgage Corporation for $800,000 in July 2024.  (*Id.* at ¶¶ 42-50).

At the hearing, Defendant McGuckin testified to the reasons and intentions behind the sale of his practices, and his sale and mortgaging of various properties.  However, as the Government correctly noted, the FDCPA "contains no 'intent' requirement" when determining whether the

selling of property would hinder the Government.  *United States v. Teeven*, 1992 WL 683683, at *7 (D. Del. Aug. 14, 1992).  Instead, the focus of the Court's analysis is whether Defendant McGuckin's actions would *have the effect of* hindering the Government.  *Id.* Because "[t]he sale of the properties . . . would surely have the effect of hindering the recovery of the debt by the [Government]," *id.* at 8, this Court finds that Defendants have not met their burden to affirmatively rebut the Government's showing that it was, and would be, hindered by Defendant McGuckin's sale of his properties.

**CONCLUSION**

For the reasons set forth, Defendants' motion to quash the prejudgment writs is denied.  An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.